UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

LINDA K. DUNN, )
)
      Plaintiff, )
)
vs. ) Case No. 08-CV-262-FHM
)
MICHAEL J. ASTRUE, )
Commissioner of the )
Social Security Administration, )
)
      Defendant. )

## OPINION AND ORDER

Plaintiff, Linda K. Dunn, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1] In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1] Plaintiff's May 10, 2005 application for Disability Insurance benefits was denied initially and upon reconsideration. A hearing before an Administrative Law Judge (ALJ) was held September 4, 2007. By decision dated September 20, 2007, the ALJ entered the findings which are the subject of this appeal. The Appeals Council denied review of the findings of the ALJ on March 12, 2008. The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003).  The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 63 years old at the time of the hearing. [R. 838].  She claims to have been unable to work since 1999[2] due to back and hip pain, obesity, gastroesophageal reflux disease (GERD), hypertension and anxiety. [R. 59, 71, 76].  Plaintiff was last insured for disability insurance benefits on December 31, 2001.  Consequently, "to obtain disability insurance benefits, Plaintiff must establish that she became disabled on or before that date." *See Washington v. Shalala*, 37 F.3d 1437, 1440 n.2 (10th Cir. 1994).  The ALJ determined that, as of the date she was last insured, Plaintiff had severe impairments consisting of morbid obesity, lumbar disk herniation and bulging, spinal stenosis and GERD. [R. 14].  He found that Plaintiff retained the residual functional capacity (RFC) to perform light work activity with a limit to occasional stooping. [R. 16].  Based upon the testimony of a vocational expert (VE), the ALJ found that Plaintiff's past relevant work as an elementary school teacher did not require performance of work-related activities precluded by her RFC as of December 31, 2001. [R. 18].  The ALJ also determined that there was other work Plaintiff could have performed and that those jobs exist in significant numbers in the economy. [R. 18-19]. He concluded, therefore, that Plaintiff was not disabled as defined by the Social

---

[2] At the hearing, Plaintiff amended her alleged onset date from May 30, 1993 to January 1, 1999. [R. 838].

Security Act before the expiration of her insured status. [R. 19]. The case was thus decided at step four, with an alternative step five finding, of the five-step evaluative sequence for determining whether a claimant is disabled. [R. 18-19]. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the ALJ erred as follows: 1) that he "failed to properly consider the opinion of the treating physicians, weigh the opinions in accordance with the regulations, rules and case law, or recontact the physicians for more information as required and he failed to utilize a medical expert when the date of onset of disability was obscure;" 2) that he "failed to properly consider the evidence of record regarding the severity of Claimant's mental impairments by supporting the step 2 determination of the sequential evaluation process with substantial evidence, and subsequently failed to perform a proper analysis of the impact of these impairments at steps 4 and 5 of the sequential evaluation process;" and 3) that he "failed to perform a proper credibility determination because he denied medical evidence of arthritis, misconstrued the medical treatment for pain and diet control, ignored evidence of mental limitations and deterioration, and selectively discussed the evidence of record." [Plaintiff's brief, Dkt. 14]. For the reasons discussed below, the Court affirms the decision of the Commissioner.

## Medical Record

The medical record in this case commences May 7, 1990 and ends October 26, 2007. Plaintiff retired from her teaching position in 1993 and has not worked since. She claims she became disabled and was unable to engage in any gainful activity since January 1, 1999. As previously noted, Plaintiff's insured status expired December 31, 2001, and

3

Plaintiff was required to establish that she was disabled from performing her past relevant work as of that date. As the ALJ explained to Plaintiff and her counsel at the hearing, the period of time thus under consideration was the time period between January 1, 1999 and December 31, 2001. While the entire administrative record has been reviewed, the Court specifically addresses the medical evidence that is relevant to the insured period and the subsequent period leading up to the issues raised in Plaintiff's allegations of error.

The medical record reflects that general medical care was provided during the relevant time period by F. David Kondos, M.D., and Bradford Boone, M.D., at Springer Medical Clinic and St. Francis Hospital. [R. 322-377, 232-321, 102-125, 162-166, 126-141, 428-439, 414-427, 205-223]. According to those records, Plaintiff was diagnosed with a left rotator cuff impingement in April 1999 which was treated conservatively and then surgically repaired in March 2000. [R. 162-166, 313, 434-439]. As of May 3, 2000, Plaintiff's motion was essentially full and her strength really good. [R. 162]. During the relevant time period, Plaintiff was also treated for chest and abdominal pain, GERD, nausea, diarrhea, fatigue, anxiety, menopausal symptoms, congestion, hypertension, right ear pain, and neck, back and hip pain. [R. 126-141, 245, 249-308, 313, 428-433].

On January 4, 2002, just five days after her insured status expired, Plaintiff was seen by Laurence Mansur, M.D., an orthopedist, at the request of Dr. Kondos. [R. 160-161]. Dr. Mansur noted Plaintiff had subjective complaints of back, leg and hip pain for more than a year "but has gotten worse in the last 6 months." He reported Plaintiff's x-rays showed degenerative changes consistent with her age (58 years old at the time of the examination). His impression was: "Low back pain with radicular symptoms consistent with a herniated disc" and he ordered an MRI. *Id.* X-rays of the chest and abdomen on January

17, 2001, interpreted by Penni Barrett, M.D., showed: minor degenerative changes in the spine; spondylotic spurring noted in the mid-thoracic spine, rather prominent at several levels; and degenerative spurring noted in the bilateral AC joints. [R. 197, 252]. The MRI conducted on January 29, 2002, revealed: congenitally very small spinal canal; L4-5 spinal stenosis; and L5-S1 left disk herniation with possible compression of the left S1 nerve root. [R. 411-413].

Dr. Mansur next saw Plaintiff on February 18, 2002, and remarked that the MRI confirmed his suspicion of disc herniation and bulge at L4-5 that would cause symptoms consistent with Plaintiff's complaints. [R. 159]. He discussed treatment options with Plaintiff and decided to start conservative therapy consisting of a series of epidural injections. *Id.* On March 19, 2002, Dr. Mansur reported Plaintiff's pain had improved from 10 to 2 on a 10-point scale and he referred her for a second injection. [R. 158]. Dr. Mansur's April 17, 2002 report indicates "very good relief of radicular symptoms," that Plaintiff was still having pain in the right buttock which "also improved some with the first two injections" and authorized a third injection, noting that she may have a myofascial trigger point in addition to disc and spinal stenosis. [R. 157].

Plaintiff commenced treatment with Scott H. Sexter, M.D., on May 8, 2002. [R. 536]. Dr. Sexter noted Plaintiff's history of: hypertension; obesity; spastic colon; anxiety disorder - situational related to her mother being in a nursing home; degenerative joint disease (DJD); and three steroid epidural injections. *Id.* Dr. Sexter saw Plaintiff on a monthly basis from June 2002 through June 2005 for problems ranging from skin tags and moles, hypertension, bronchitis, epigastric pain, GE reflux, constipation, anxiety, insomnia and

5

weight control. [R. 528-535, 520-522, 515-519, 509-511, 503-506, 500-501, 495-499, 475-482, 470-474, 466-479].

Christopher A. Browne, M.D., an orthopedical specialist, saw Plaintiff in consultation with Dr. Sexter on September 2, 2005. [R. 465]. Noting that epidural injections were helpful in the past, Dr. Browne referred Plaintiff to St. Francis Hospital for a new series of steroid epidural injections. [R.462, 761-768]. On September 23, 2005, Dr. Browne wrote:

> HISTORY: Ms. Dunn returns today. She has a history of low back and hip pain. I injected her last time locally, and she did reasonably well. In the intervening time, we found a MRI she had in 2002, and she brought in some notes from Springer Clinic. Apparently, they did a MRI, and it does show canal stenosis and herniated disk in 2002. She did receive epidural steroids which did show some relief. The patient herself says that she is doing better, although she still has some pain into the buttock area.
> PHYSICAL EXAMINATION: Otherwise, is unchanged.
> IMPRESSION: Right hip and lower extremity pain suggestive of radiculopathy.
> PLAN: I would recommend a re-evaluation with MRI for comparison and possible repeat epidural.

[R. 464].

The MRI was performed October 12, 2005. [R. 769-770]. On October 18, 2005, Dr. Browne wrote:

> HISTORY OF PRESENT ILLNESS: Ms. Dunn returns with her MRI of her lumbar spine. It does show a continued broad-based disc bulge at the L5-S1. The patient still has complaints of pain into the hip. She did feel the injections we did last time helped somewhat. She is wanting to proceed with those again today if possible as they are going on a cruise this Friday.
> PHYSICAL EXAMINATION: Examination today shows focal tenderness in the hip.
> IMPRESSION: Herniated discs L5-S1 with some focal tenderness in the hip.
> PLAN: I recommend an epidural for diagnostic and therapeutic purposes. In addition, today we gave her two trigger point

> injections into the buttock area. We will see her back following her epidural.

[R. 463].

Dr. Browne's November 23, 2005, notation is as follows:

> HISTORY OF PRESENT ILLNESS: Ms. Dunn returns today. She had the epidural injection. I believe Dr. Evanson did the injection. She said it really was not that much help. She continues to have discomfort. Actually the epidural may have worsened her discomfort. She is still complaining of pain into the low back, leg and hip.
> PHYSICAL EXAMINATION: Unchanged.
> IMPRESSION: Herniated disc L5-S1 with no obvious radiographic abnormalities in the hip with continued hip pain and leg pain.
> PLAN: As she did not respond to the epidural I will go ahead and refer her to Dr. Tyler Boone or Dr. Mark Capehart for their evaluation and their expertise to see if they feel she would benefit from further evaluation of her lumbar spine and/or treatment.

[R. 461].

Lumbar mylegrams and CT scans were conducted at St. Francis Hospital on March 21, 2006, at the behest of R. Tyler Boone, M.D. [R. 459-460, 757-758]. On April 3, 2006, Dr. Boone wrote:

> Linda is here on follow up. She had the mylegram and postmyelographic CT obtained. The study is a little bit compromised because of her size, but she does have definite filling defects, especially at the L4-5 and L5-S1. Postmyelographic CT notes the stenosis really L3-4, L4-5 and L5-S1.
>
> Linda would like to consider another epidural steroid injection. She last had one in the fall with Dr. Emerson. She also indicates she is looking at going to the Duke University Diet Weight reduction program and I encouraged her to pursue that. I also encouraged her to look at the Health Zone possibly with their water aerobics program. We are also going to set her up with some physical therapy to work again for some lumbar

> rehabilitation and modalities. Certainly surgery is an option, but with her size, she is at increased risk for perioperative problems and complications and she wants to try some weight reduction before giving surgery any consideration.
>
> Ms. Dunn is in my opinion significantly disabled from the spinal stenosis. She really cannot do anything, which involves prolonged standing and walking and has to sit down for everything. She previously worked as a teacher and I do not see her ever being able to return to an education or teaching type job because she simply cannot stand or walk for any duration. From my standpoint, we would see Linda back after this epidural steroid injection is obtained.

[R. 458].

Dr. Boone did not see Plaintiff again until July 5, 2006, at which time he said:

> Linda is here on follow-up. I have not seen her since April, but she did go to the Duke weight reduction program and reports she has lost about 30 pounds. She is going to be heading back to try to obtain some additional weight reduction. She has applied for social security disability but tells me that she was turned down. I explained to her that she does have a degenerative condition of the lumbar spine with development of spinal stenosis. This is not something she was born with, but she does have pretty significant stenosis, which is going to affect her ability to stand and walk, and I feel she is disabled from teaching.
>
> The epidural steroid injection she had did help her out for at least short term, but at this point, I would recommend no further injections. She has been recently started with methadone for her pain management. At some point, surgery may be an option, but she does not want to consider that at this point. I encouraged her to continue with weight reduction, exercise, such as swimming, etc. I told her to come back in to see us within the next couple months if she does not feel like she is making any headway.

[R. 725].

Over the next year, Plaintiff was seen by Dr. Sexter and other community care physicians for various complaints, including ear pain, left foot injury, gastric problems,

8

cough, sinusitis and for medical clearance for laparoscopic banding surgery (gastric procedure which limits the amount of food that can be assimilated through restrictive measures).[3] [R. 539-555, 701-724, 806-815].

On August 10, 2007, Dr. Sexter wrote the following letter on Plaintiff's behalf:

> Linda has been diagnosed with diabetes, degenerative joint disease, back pain with radiculopathy, hypertension, sleep apnea, obesity, and anxiety with depression.
>
> Linda suffers from chronic back pain that radiates through her hips and into her legs. Her pain increases with standing, sitting, or walking too long, along with bending, lifting, cold or wet weather, or remaining in one position too long. She needs to be able to alternate between sitting, standing, and walking several times every hour to relieve pain. She also needs to take frequent rest breaks several times a day.
>
> Linda's hands shake and her grip is weak. She is unable to manipulate small objects or grasp a hammer. She is unable to lift over 10 pounds with her hands.
>
> Linda is unable to sleep at night without the use of a CPAP machine. The apnea makes it difficult for her to fall asleep and her sleep is not restful, even with the CPAP machine.
>
> Due to Linda's morbid obesity, she suffers from shortness of breath and overall fatigue. She is unable to participate in most activities, due to her lack of stamina.
>
> Additionally, Linda suffers with anxiety and depression. She is taking medication which only partially controls her symptoms. Stress should be avoided. In my opinion, the combination of impairments would make it very difficult for Linda to complete an eight hour workday on a sustained basis.

[R. 538].

---

[3] See medical encyclopedia online at: http://www.nlm.nih.gov/medlineplus/ency/article/007388.htm, update date: 2/12/2009

Also in the record are evaluations by Social Security Administration consultative physicians. Ron E. Smallwood, Ph.D., reviewed the records and prepared a psychiatric review technique form (PRT) on August 4, 2005. [R. 453-457].[4] Dr. Smallwood assessed mild functional limitations in the areas of restriction of activities of daily living; difficulties in maintaining social functioning; difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. [R. 455]. In explaining his findings, Dr. Smallwood wrote:

> 61 yo (age 50@ DLI) - who alleges anxiety and depression. MER from the treating physician notes that she has been treated for anxiety and depression for a number of years with medication which appeared to be helping her mental condition. There was no referral for mental health treatment and none was recommended up through the DLI of 12/2001. ADL's [activities of daily living] appear to have been WNL's [within normal limits].

[R. 457].

An RFC was prepared by Carmen Bird, M.D., an agency consultant, on August 5, 2005. [R. 442-449]. Dr. Bird examined the medical record, noting in particular Dr. Kondos' examination record of December 15, 2001, and the MRI in January 2002. [R. 443]. Plaintiff was assessed with an RFC for lifting and/or carrying 20 pounds occasionally, 10 pounds frequently; standing, walking and sitting with normal breaks for a total of 6 hours in an 8-

---

[4] Under the regulations, when evaluating mental impairments, the agency must follow a "special technique." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The agency is required to rate the degree of a claimant's functional limitations caused by those impairments in the areas of "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ then applies those ratings in determining whether the claimant's mental impairments are severe at step two and, if so, whether these severe impairments "meet[ ] or [are] equivalent in severity to a listed mental disorder" at step three. Id. §§ 404.1520a(d)(1-2), 416.920a(d)(1-2). At the ALJ hearing level, "[t]he decision must include a specific finding as to the degree of limitation in each of [those] functional areas." Id. §§ 404.1520a(e)(2), 416.920a(e)(2).

hour workday and stooping only occasionally. [R. 443-444]. An agency reviewer, Milton Leonard, Jr., sent the records to another physician, E. Montoya, M.D., on March 17, 2006, with the following note:

> Clt reported no new sources seen prior to her 12/31/01 DLI. Please advise--Clt has a hx. of morbid obesity with associated back and hip problems. A light RFC with standing and walking limited to 2 hrs. would allow prior to her DLI, but onset would be an issue (according to the MER, I was thinking 12/1/01 onset). However, findings are not entirely inconsistent with the previous light RFC. Please complete appropriate RFC if you agree with an allowance. If not, complete 416 affirming the previous RFC of 8/5/05 as written-

[R. 441]. On March 20, 2006, Dr. Montoya reviewed all the medical evidence in the file and affirmed Dr. Bird's RFC assessment. [R. 440].

## The ALJ's Decision

The ALJ determined that Plaintiff had severe impairments of morbid obesity, lumbar disk herniation and bulging, spinal stenosis and GERD through the date she was last insured but that those impairments did not meet or equal a listing. [R. 14]. He acknowledged the existence of medically determinable mental impairments of anxiety and depression but concluded they caused no more than minimal limitation in Plaintiff's ability to perform basic work activities and were therefore nonsevere. He found Plaintiff had the RFC to: lift/carry 20 pounds occasionally or 10 pounds frequently; to stand/walk or sit for 6 hours during an 8-hour workday; to use her hands and feet for operation of controls; and that there was a limit to occasional stooping. [R. 16]. He found Plaintiff had anxiety and affective disorder for which she took medications but that there were no work-related limitations and her medications did not preclude performance of work functions. *Id.* He found Plaintiff had mild to moderate pain but that she was able to remain attentive. *Id.*

The ALJ recounted Plaintiff's testimony from her hearing and summarized her medical records from Springer Clinic. [R. 17]. He acknowledged the medical evidence showing spondylotic spurring of the mid-thoracic spine and degenerative spurring in the bilateral AC joints in 2001. He noted the reports from Penni Barrett, M.D., saying she: "observed no acute abnormality." *Id.* He said: "Ms. Dunn was encouraged to engage in a regular weight bearing exercise program to reduce her risk factor for osteoporosis. However, by August 22, 2001, her weight was at 316." *Id.* As to the medical evidence relating to Plaintiff's peptic ulcer disease and GERD, the ALJ noted Dr. Kondos' statement that Plaintiff was doing well with medications although having some discomfort with esophageal reflux disease. *Id.*

The ALJ was not entirely persuaded by Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms after weighing them against the evidence of record prior to December 31, 2001. [R. 18]. In explaining his credibility determination, the ALJ wrote:

> No independent evaluation of [Plaintiff's] alleged physical limitations in 1999-2001 exists to support her testimony. There was thoracic spondylotic spurring and degenerative spurring in her bilateral AC joints in 2001. But Penni Barrett, M.D. of the Springer Clinic observed no acute abnormality in February 2001. Therefore, there is no identifiable basis in the record to give credence to [Plaintiff's] description of the extent of her impairment prior to December 2001. The medical record also does not indicate that [Plaintiff's] GERD was an unmanageable difficulty before December 2001. Finally, [Plaintiff] does not appear to have made a determined effort to lose the weight that her treating sources urged her to lose. Rather, she actually gained weight.

[R. 18].

After taking testimony from a vocational expert (VE) at the hearing, the ALJ concluded that Plaintiff was able to return to her past relevant work (PRW) as an elementary school teacher through the date last insured. *Id.*  In an alternative finding, the ALJ determined that even if Plaintiff could not return to her elementary school teacher work, there were sedentary jobs in the regional and national economy that Plaintiff could perform such as social worker assistant, resident counselor, appointments clerk and regulations clerk and that these jobs exist in significant numbers in the economy. [R. 18-19].  He concluded that Plaintiff was not under a disability as defined in the Social Security Act prior to December 31, 2001. *Id.*

## **Discussion**

Plaintiff complains that the ALJ failed to properly consider the opinions of her treating physicians, that he should have recontacted them for more information and that he failed to utilize a medical expert when the date of onset was obscure.  The two physicians whose opinions Plaintiff claims the ALJ improperly ignored are  Dr. Boone and Dr. Sexter.   Dr. Boone[5] saw Plaintiff in consultation with Dr. Browne in April 2006 and opined in July 2006 that Plaintiff could not return to her teaching job. [R. 458, 725].  Dr. Sexter saw Plaintiff for the first time on May 8, 2002, and opined in 2007 that Plaintiff's combination of impairments "would make it very difficult" for her to complete an eight hour workday on a sustained basis. [R. 536, 538].  Plaintiff contends the doctors relied upon the 2005 MRI for their opinions and because there was essentially no change between the 2002 MRI and the

---

[5] R. Tyler Boone, M.D., is not the same Dr. Boone (Bradford) who treated Plaintiff in 2000.

2005 MRI, those opinions were applicable to the relevant time period before Plaintiff's insured status expired. The Court disagrees.

Neither physician was treating Plaintiff prior to December 31, 2001. Neither physician reported his opinion was reached on the basis of the MRI conducted in 2002 and there is no suggestion by either doctor that he intended to relate a "retrospective opinion." While Dr. Boone did refer to the 2005 MRI in his April 3, 2006 report, there is no indication that it was the sole basis for his opinion. [R. 458]. In fact, Dr. Boone's treatment records indicate that Plaintiff's weight and activity level were among the factors he considered before concluding that Plaintiff "is disabled from teaching."[6] [R. 725, July 2006 notation: encouraged Plaintiff to continue with weight reduction and exercise]. Dr. Sexter's list of impairments that, in his opinion, combined to cause Plaintiff's disability in 2007 included diabetes and sleep apnea, both of which were diagnosed years after Plaintiff was last insured. [R. 538, 558, 771]. The ALJ's failure to address those opinions as medical evidence related to Plaintiff's RFC prior to the insurance expiration date, therefore, was not error. *See Potter v. Sec. of Health & Human Svs.*, 905 F.2d 1346 (10th Cir. 1990) (disability identified nearly four years after expiration of insured status and comment by physician that it was "conceivable" earlier symptoms were part of later diagnosis not substantial evidence that disability existed before expiration date).

The physicians who treated Plaintiff during the relevant time period did not suggest Plaintiff was disabled. None of the pre-2002 records cited by Plaintiff establish that she was disabled from the performance of any gainful activity as of December 31, 2001. Nor

---

[6] Plaintiff's weight on December 15, 2001, was 306 lbs. [R. 205]. On May 7, 2006, Plaintiff weighed 361.6 lbs. [R. 558].

is there any medical opinion in the record prior to 2006 that Plaintiff had functional limitations so severe that she was unable to engage in any work-related activity.

On the other hand, there is in the record an RFC assessed for the relevant time period by an agency physician who reviewed the medical evidence, including the January 2002 MRI, and concluded Plaintiff could perform light work with stooping restrictions. [R. 442-449]. That opinion was reviewed specifically to consider a more restricted RFC and possible onset date by another medical consultant and was affirmed. [R. 440-441]. The ALJ obviously adopted those opinions in his RFC determination. The ALJ is entitled to review and weigh the medical evidence and to assess the claimant's RFC. *See Howard v. Barnhart*, 379 F.3d 945 (10th Cir. 2004) (the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record).

Because the record supports the ALJ's determination that Plaintiff was not disabled as defined by the Social Security Act prior to December 31, 2001, it was not necessary for the ALJ to recontact Dr. Sexter and Dr. Boone to determine a disability onset date. *See* 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1) (additional evidence or clarification from medical source to be sought when report contains a conflict or ambiguity that must be resolved, does not contain all necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques). The Court finds Plaintiff's allegation that the ALJ failed to follow correct legal standards in considering the treating physician's opinions is without merit.

### **Mental Impairments**

The ALJ acknowledged that the record shows existence of medically determinable mental impairments of anxiety and depression. [R. 14]. He noted that Plaintiff had no

mental health counseling prior to the date she was last insured. Applying the "special technique" required by the agency's regulations, he rated the degree of Plaintiff's functional limitations caused by her mental impairment in the areas of "[a]ctivities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). Based upon his findings that mild limitations existed in the first three areas and that there were none in the fourth area, he determined Plaintiff's mental impairments were not severe prior to December 31, 2001. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1).

Plaintiff contends the ALJ was "absolutely wrong" in his opinion that she did not appear to have mental health counseling prior to her date last insured. [Plaintiff's brief, Dkt. 14, p. 4]. Plaintiff points to treatment records from Springer Clinic, Inc., in January 2000 as evidence that the ALJ's opinion is incorrect and states: "[i]t is obvious from the evidence that [she] had some sort of evaluation and treatment by the doctors at Laureate." *Id.* The first notation Plaintiff cites as support for this argument is a report given by Plaintiff to her primary care physician while being treated for abdominal pain on January 20, 2000, as follows: "saw Chelf in F/U 'Bipolar'? / Listing / Dx ? s. Off meds for <u>now</u>" (emphasis in original). [R. 300]. Plaintiff also points to a list of "multiple complaints" she submitted to her Springer Clinic physician on January 10, 2000, which included her report of a telephone conversation with "Chelf" and a "Chelf appt." [R. 306-308]. Neither of these notations constitutes medical opinion evidence from a treating source as defined by 20 C.F.R. § 404.1527(a)(2) (medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of a

claimant's impairments).[7]  The notes appear in the doctor's treatment records as statements by Plaintiff regarding her medical history.  They are not medical findings.

Plaintiff has not produced any treatment records from Laureate Psychiatric Hospital and Clinic. [R. 62-63].  Nor has she provided the evaluation she claims was conducted by John Chelf, M.D. [Plaintiff's brief, Dkt. 14, p. 4].  It is the claimant's burden to provide evidence of functional limitations. *Howard*, 379 F.3d at 948.  Plaintiff did not advise the agency that those records were necessary in order to determine her disability claim.  Nor did she request the ALJ's assistance in obtaining the records.  In cases such as this one where the claimant was represented by counsel at the hearing before the ALJ, "the ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored,"and the ALJ "may ordinarily require counsel to identify the issue or issues requiring further development." *Hawkins v. Chater,* 113 F.3d 1162, 1167 (10th Cir.1997).  Although the ALJ has the duty to develop the record, the ALJ is not required to act as the claimant's advocate in order to meet this duty. *See Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008) (neither counsel nor claimant obtained or tried to obtain the records about which they complained on appeal, suggesting that counsel abandoned his role as advocate in favor of relegating that responsibility to the ALJ).

---

[7] Social Security regulations define a treating source as follows: Treating source means your own physician or psychologist who has provided you with medical treatment or evaluation and who has or has had an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with a physician or psychologist when the medical evidence establishes that you see or have seen the physician or psychologist with a frequency consistent with accepted medical practice for the type of treatment and evaluation required for your medical condition(s). We may consider a physician or psychologist who has treated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment is typical for your condition(s). 20 C.F.R. 404.1502.

*See also Shannon v. Chater*, 54 AF.3d 474, 488 (8th Cir. 1995) (claimant's failure to obtain or even try to obtain records suggests they may only have been of minor importance).

Moreover, Plaintiff has not explained how those records, provided they exist and are applicable to the relevant time period, demonstrate that her mental impairment significantly limited her ability to do basic work activities. *See Branum v. Barnhart*, 385 F.3d 1268 (10th Cir. 2004); 20 C.F.R. § 416.921(a).  The mere fact that Plaintiff received counseling would not necessarily establish that Plaintiff's mental impairment was severe. *See Hinkle v. Apfel*, 132 F.3d 1349, 1352 (10th Cir.1997) (mere presence of a condition or ailment documented in the record is not sufficient proof that the claimant is significantly limited in the ability to do basic work activities).

The ALJ's PRT findings mirror those found by Ron Smallwood, Ph.D. [R. 15, 453-457].  Nothing in the medical record conflicts with Dr. Smallwood's opinion.  See *Howard*, 379 F.3d at, 947 ("When the ALJ does not need to reject or weigh evidence unfavorably, the need for express analysis is weakened."). The Court finds no reversible error was committed by the ALJ in concluding that Plaintiff's mental impairment was not severe at step two.  Because this decision was reached at step two, it was not necessary for the ALJ to evaluate Plaintiff's mental impairments at step three.

### Credibility Determination

Plaintiff's complaints regarding the ALJ's credibility determination that are related to the ALJ's failure to assign controlling weight to the opinions of Drs. Boone and Sexter are unavailing, as explained earlier in this opinion and order.  With regard to the "other pertinent evidence detracting from the decision" as argued by Plaintiff, the Court finds

no basis for reversal. Contrary to Plaintiff's contention, the ALJ did not ignore evidence that provides the "loose nexus" between Plaintiff's allegations and the pain-producing impairment. See *Luna v. Bowen*, 834 F.2d 161, 163-64 (10th Cir. 1987). The ALJ acknowledged that the objective medical evidence established severe impairments of morbid obesity, lumbar disk herniation and bulging, spinal stenosis and GERD. [R. 14].

In deciding whether to believe Plaintiff's assertions of pain, the ALJ noted the inconsistency of those complaints with the medical evidence from the relevant time period. [R. 17-18]. Subjective complaints of pain must be evaluated in light of plaintiff's credibility and the medical evidence. *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991) (discussing factors that should be considered when evaluating credibility of pain testimony). The ALJ reasonably concluded based on the medical evidence presented that, while Plaintiff had some pain associated with spinal stenosis and disk herniation, her pain was not so severe as to preclude any substantial gainful employment prior to December 31, 2001. *See Gossett v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988) (disability requires more than mere inability to work without pain; to be disabling pain must be so severe as to preclude any substantial gainful employment).

Credibility determinations are peculiarly the province of the fact-finder. *See Diaz v. Sec. of Health & Human Svs.*, 898 F.2d 774, 777 (10th Cir. 1990) (court does not upset credibility determinations when supported by substantial evidence). That the ALJ did not mention "the depth and frequency of Plaintiff's GERD difficulties" and "spastic colon" or address Plaintiff's activity of daily living is not grounds for reversal. *See Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (holding that an ALJ is not required to discuss every piece of evidence). Basically, Plaintiff is dissatisfied with the weight given

the evidence by the ALJ. Plaintiff essentially asks the Court to reweigh the evidence. This it cannot do. *Hamlin v.* Barnhart, 365 F.3d 1208 (10th Cir. 2004) citing Kelley *v. Chater*, 62 F.3d 335, 337 (10th Cir. 1995). The Court finds no reason to disturb the ALJ's credibility determination in this case.

## **Conclusion**

The record as a whole contains substantial evidence to support the determination of the ALJ that Plaintiff was not disabled prior to the expiration of her insured status. Accordingly, the decision of the Commissioner finding Plaintiff was not disabled before December 31, 2001, is AFFIRMED.

SO ORDERED this 15th day of May, 2009.

*[signature]*
FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE